Snell Island SNF LLC v. National Labor Relations Board

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2008

(Argued: April 15, 2009)                                    Decided: June 17, 2009)

Docket Nos. 08-3822-ag (L), 08-4336-ag (XAP)

SNELL ISLAND SNF LLC, d/b/a SHORE ACRES REHABILITATION AND NURSING CENTER, LLC, and HGOP, LLC, d/b/a CAMBRIDGE QUALITY CARE, LLC,

>    *Petitioners-Cross-Respondents*,

>    -v.-

NATIONAL LABOR RELATIONS BOARD,

>    *Respondent-Cross-Petitioner.*

Before: WINTER, CABRANES, and SACK, *Circuit Judges.*

Petitioners—two companies whose employees had recently voted to join a labor union—seek review of an order of the National Labor Relations Board ("NLRB" or the "Board"), which concluded that petitioners had violated various provisions of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (the "Act"), by refusing to recognize and bargain with the United Food and Commercial Workers Union, Local 1625. The Board had previously certified a vote by petitioners' employees in favor of union representation. Petitioners argue that, in each instance, the Board acted through an unlawfully constituted panel of only two members, because the Act requires that panels of the Board contain a minimum of three members, with two members necessary for a quorum. We hold that the panel in this case was a lawfully convened panel of three members, and that the panel continued to operate in accordance with the Act after one of its members ceased to serve on the Board, because there remained a quorum of two members. We also hold that the decision by a regional director of the NLRB to overrule petitioners' objections to the union election without

1

holding a hearing was not an "abuse of discretion."

The petition for review is DENIED. The cross-application of the NLRB for enforcement is GRANTED.

CHARLES P. ROBERTS, III, (Clifford H. Nelson, Jr., *on the brief*), Constangy, Brooks & Smith, LLC, Winston-Salem, NC, and Atlanta, GA, *for Petitioners-Cross-Respondents*.

RUTH E. BURDICK, Attorney (Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Robert J. Englehart, Supervisory Attorney, and David A. Seid, Attorney, *on the brief*), National Labor Relations Board, Washington, D.C., *for Respondent-Cross-Petitioner*.

JOSÉ A. CABRANES, *Circuit Judge*:

We consider two questions arising from a labor dispute adjudicated before a panel of the National Labor Relations Board ("NLRB" or the "Board"): (1) whether an adjudication by a two-member panel of the NLRB is permitted under Section 3(b) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (the "Act"), where a third member of the panel was disqualified because his term had expired and the total membership of the NLRB was only two members; and (2) whether it was an "abuse of discretion" for a regional director of the NLRB to overrule an employer's objections to a union election without holding a hearing or interviewing witnesses.

## BACKGROUND

The following facts are not in dispute. *See generally Snell Island SNF LLC*, 352 NLRB No. 106, at 2-3 (2008). The NLRB is the administrative agency of the United States responsible for overseeing labor-union elections and adjudicating certain types of labor disputes. It consists of five members, each of whom is appointed by the President, with the advice and consent of the Senate, for a term of five years. *See* 29 U.S.C. § 153(a) (providing further that "[t]he President shall designate one member to serve as Chairman of the Board"). In the ordinary course, the NLRB hears and decides cases by

2

panels of three members in accordance with section 3(b) of the Act, which provides that the NLRB

> is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise. . . . A vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board, and three members of the Board shall, at all times, constitute a quorum of the Board, except that two members shall constitute a quorum of any group designated pursuant to the first sentence hereof.

29 U.S.C. § 153(b).[1]

At the beginning of December 2007, the NLRB consisted of four members—Wilma B. Liebman, Peter C. Schaumber, Peter N. Kirsanow, and Dennis P. Walsh—whose terms were staggered. One seat was vacant, and the terms of Kirsanow and Walsh were set to expire on December 31, 2007. Anticipating that no replacement appointments were forthcoming, and that it would lose its three-member quorum, the Board delegated all of its powers to a three-member panel consisting of Liebman, Schaumber, and Kirsanow, effective December 28, 2007. In reaching this decision, which the Board memorialized in a December 20, 2007, Minute of Board Action, the Board relied on the plain language of the Act and also

> relied on . . . the March 4, 2003 opinion issued by the Office of Legal Counsel of the U.S. Department of Justice (OLC) in response to the Board's May 16, 2002 request for OLC's opinion whether the Board may issue decisions during periods when three or more of the five seats on the Board are vacant. OLC's opinion concluded that "if the Board delegated all of

---

[1] The National Labor Relations Act—which is also known as the "Wagner Act" after its sponsor, Senator Robert F. Wagner of New York, *see The Encyclopedia of New York City* 1231 (Kenneth T. Jackson ed., 1995)—was enacted and took effect in 1935. *See generally* Lawrence M. Friedman, *American Law in the 20th Century* 167-69 (2002) (describing the reception of the Act by business and labor interests and its effect on commerce and politics in the New Deal, Second World War, and post-war years). The Act, which was among the first New Deal regulations to be upheld by the Supreme Court, *see NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937) ("We think it clear that the National Labor Relations Act may be construed so as to operate within the sphere of constitutional authority."), originally created a three-member Board, with two members necessary for a quorum, *see* Pub. L. No. 74-198, § 3(a), 49 Stat. 449, 451 (1935) ("There is hereby created a board . . . which shall be composed of three members . . . ."); *id.* § 3(b) ("A vacancy in the Board shall not impair the right of the remaining members to exercise all the powers of the Board, and two members of the Board shall, at all times, constitute a quorum."). In 1947, Congress passed the Labor Management Relations Act, which expanded the membership of the Board to five and created the panel system used today. *See* Pub. L. No. 80-101, §§ 3(a)-(b), 61 Stat. 136, 139 (1947) ("Taft-Hartley Act" or "Taft-Hartley amendments").

its powers to a group of three members, that group could continue to issue decisions and orders as long as a quorum of two members remained." . . .

OLC's opinion stands for the proposition that the Board has the authority to issue two-member decisions and orders, but that it is within the Board's discretion whether or not to exercise that authority.

Addendum to J.A. 2 ("Minute of Board Action," Dec. 20, 2007, at 2); *see also* M. Edward Whelan, III, Quorum Requirements: Memorandum Opinion for the Solicitor, National Labor Relations Board 2 (Mar. 4, 2003), *available at* http://www.usdoj.gov/olc/2003/nlrb_quorum_03042003.pdf (last visited June 11, 2009) (on file with Clerk of Court) ("OLC Opinion"). When Kirsanow's term expired on December 31, the panel continued to operate in the normal course with a two-member quorum consisting of Liebman and Schaumber. As of the filing of this opinion, Liebman and Schaumber remain the only two members of the Board.

Petitioner Snell Island SNF LLC operates a nursing home and long-term care facility in St. Petersburg, Florida, called "Shore Acres." Petitioner HGOP, LLC, provides employee-staffing services to the Shore Acres facility and other nursing homes, and has its principal place of business in Brooklyn, New York. *See Snell Island SNF LLC*, 352 NLRB No. 106, at 1. Petitioners are joint employers of the employees of Shore Acres.

On December 12, 2007, at a representative election held under the auspices of the NLRB, *see* 29 U.S.C. § 159, employees at Shore Acres elected United Food and Commercial Workers Union, Local 1625 (the "Union"), as their exclusive collective-bargaining representative. Petitioners promptly filed with the NLRB thirteen objections to the election. A regional director of the NLRB reviewed the objections[2] and recommended in January 2008 that they be overruled in their entirety.

---

[2] The NLRB is authorized by statute "to delegate to its regional directors its powers . . . to determine the unit appropriate for the purpose of collective bargaining, to investigate and provide for hearings, and determine whether a question of representation exists, and to direct an election or take a secret ballot . . . and certify the results thereof . . . ." 29 U.S.C. § 153(b); *see also* 29 C.F.R. § 102.69(a) ("Unless otherwise directed by the Board, all elections shall be conducted under the supervision of the Regional Director in whose Region the proceeding is pending.").

Petitioners filed exceptions to the regional director's recommendation and on March 13, 2008, a two-member panel of the Board—consisting of Liebman and Schaumber—overruled the exceptions and issued an unpublished Decision and Certification of Representative. Footnote 1 to that decision explained the number and selection of the panel members:

> Effective midnight December 28, 2007, Members Liebman, Schaumber, Kirsanow, and Walsh delegated to Members Liebman, Schaumber, and Kirsanow, as a three-member group, all of the Board's powers in anticipation of the expiration of the terms of Members Kirsanow and Walsh on December 31, 2007. Pursuant to this delegation, Members Liebman and Schaumber constitute a quorum of the three-member group. As a quorum, they have the authority to issue decisions and orders in unfair labor practice and representation cases. *See* Sec. 3(b) of the Act.

J.A. 71.

Following the March 13 Decision and Certification, petitioners refused to recognize and bargain with the Union.[3] On May 16, 2008, the Union filed an unfair labor practice claim with the NLRB, which was referred to the regional director and ultimately adjudicated by the same two-member panel of the Board. On July 18, 2008, the two-member panel issued a Decision and Order concluding that petitioners had engaged in unfair labor practices by refusing to negotiate with the Union and ordering petitioners to meet with the Union. *See Snell Island SNF LLC*, 352 NLRB No. 106, at 2-3. The July 18 Decision and Order contained a footnote substantially similar to footnote 1 in the March 13 Decision and Order but indicating that President Bush had, in the interim, designated Schaumber as Chairman.

This appeal followed. Before this Court, petitioners argue principally that the July 18 and March 13 Decisions and Orders were not issued by a properly constituted panel of the NLRB

---

[3] Petitioners stated to the NLRB that "they are refusing to bargain in this case in order to secure judicial review of the certification [of the union election] issued by the Board." J.A. 85 (Resp'ts' Answer to Compl., Feb. 15, 2008, ¶ 13). *See Hall-Brooke Hosp. v. NLRB*, 645 F.2d 158, 159 n.2 (2d Cir. 1981) ("Certification decisions are not 'final orders' under §§ 10(e) and (f) of the NLRA, and are therefore not judicially reviewable. Instead, to obtain judicial review, aggrieved employers can refuse to bargain with certified representatives, thus subjecting themselves to unfair labor practice proceedings." (citations omitted)).

because only two Board members participated in the adjudication. In the alternative, petitioners contend that the NLRB abused its discretion with respect to two of petitioners' thirteen objections to the union election, which objections petitioners argue should not have been overruled without interviewing witnesses or conducting an evidentiary hearing. The NLRB has filed a cross-application for enforcement of its July 18 Decision and Order.

## DISCUSSION

### I. Jurisdiction

We have jurisdiction to review final orders of the NLRB pursuant to section 10(f) of the Act. *See* 29 U.S.C. § 160(f) ("Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business . . . ."). As we have previously explained, to obtain judicial review of a union's certification by the Board, an employer must refuse to bargain, prompting an unfair labor practice finding—a final order that we may review. *See NLRB v. Arthur Sarnow Candy Co.*, 40 F.3d 552, 556 n.5 (2d Cir. 1994). Accordingly, we consider in this appeal both the March 13 Decision and Order (certifying a union election), and the July 18 Decision and Order (finding an unfair labor practice). *See* 29 U.S.C. § 159(d) ("Whenever an order of the Board . . . is based in whole or in part upon facts certified following an investigation [of a union election] and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record . . . and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part of the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript.").

### II. Quorum Requirement

Petitioners contend that the NLRB issued its March 13 and July 18 Decisions and Orders without statutory authority because only two Board members participated in those adjudications.

According to petitioners, section 3(b) of the Act requires that a panel of the Board consist of at least three members. Petitioners acknowledge that once a three-member panel is duly constituted, the panel may continue if one member should become unavailable so long as there remains a quorum of two members. However, petitioners argue that the NLRB never effectively constituted a three-member panel in this case because "[t]here never was any intent that th[e] three-member group [consisting of Liebman, Schaumber, and Kirsanow] would actually issue decisions and orders." Petitioners' Br. at 19. Instead, because "Kirsanow's term was set to expire in three days, . . . the Board knew he would not be around to exercise the powers being delegated." *Id.* Therefore, petitioners conclude that the December 28, 2007, delegation of all powers to the three-member panel of Liebman, Schaumber, and Kirsanow was "an acknowledged *sham*." *Id.* (emphasis added).

### A. Standard of Review

Petitioners argue that our review of the NLRB's "power or jurisdiction" is "plenary and de novo." Petitioners' Br. at 14 (citing *Railroad Yardmasters of America v. Harris*, 721 F.2d 1332, 1338 (D.C. Cir. 1983)). We note that the cited passage of *Railroad Yardmasters* does not discuss a standard of review at all; instead, it discusses whether a question regarding an agency's "power or jurisdiction" that was not raised in an administrative proceeding was waived in a court proceeding, 721 F.2d at 1338. In any event, *Railroad Yardmasters* was decided before the Supreme Court's landmark decision in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), which established a two-step process for reviewing statutes that govern federal agencies. Our Court has recently explained the *Chevron* standard of review as follows:

> At step one, we consider whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. To ascertain Congress's intent, we begin with the statutory text because if its language is unambiguous, no further inquiry is necessary. Only if we determine that Congress has not directly addressed the precise question at issue will we turn to canons of construction and, if that is unsuccessful, to legislative history to see if those interpretative clues permit us to identify Congress's clear intent.

> If, despite these efforts, we still cannot conclude that Congress has directly addressed the precise question at issue, we will proceed to *Chevron* step two, which instructs us to defer to an agency's interpretation of the statute it administers, so long as it is reasonable.

*N.Y. State Office of Children & Family Servs. v. U.S. Dep't of Health & Human Servs. Admin. for Children & Families*, 556 F.3d 90, 97 (2d Cir. 2009) (citations and internal quotation marks omitted). We apply the two-pronged *Chevron* analysis even where, as here, the question presented involves an agency's jurisdiction or power to act. *See Miss. Power & Light Co. v. Mississippi*, 487 U.S. 354, 380-81 (1988) (Scalia, J., concurring) (collecting cases and noting that "it is settled law that the rule of deference applies even to an agency's interpretation of its own statutory authority or jurisdiction"); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986) ("[T]he Court of Appeals was incorrect to state on the facts of this case that the [agency's] expertise was not deserving of deference because of the 'statutory interpretation-jurisdictional' nature of the question at issue. An agency's expertise is superior to that of a court when a dispute centers on whether a particular regulation is reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of the Act the agency is charged with enforcing; the agency's position, in such circumstances, is therefore due substantial deference." (citation and internal quotation marks omitted)); *Mathirampuzha v. Potter*, 548 F.3d 70, 82 (2d Cir. 2008) ("[W]e defer to agencies' reasonable interpretations of ambiguous language in the statutes they administer, including the scope of those statutes and the types of claims they cover." (citing *Chevron*, 467 U.S. at 844)); *Nutritional Health Alliance v. FDA*, 318 F.3d 92, 97 (2d Cir. 2003) ("When an administrative agency asserts jurisdiction to regulate a particular subject matter of public concern based on its construction of a statute that it administers, our analysis is governed by *Chevron* . . . ." (footnote omitted)); *Connecticut ex rel. Blumenthal v. U.S. Dep't of the Interior*, 228 F.3d 82, 93 (2d Cir. 2000) (rejecting an argument that "*Chevron* deference is inappropriate . . . because less deference is owed to agency determinations that expand an agency's jurisdiction").[4]

---

[4] Even before *Chevron* was decided, the Supreme Court afforded deferential treatment to the NLRB's interpretation of the scope of its powers under the Act. *See NLRB v. City Disposal Sys., Inc.*,

**B. Other Circuits**

Ours is not the only court to consider the question of the NLRB's quorum requirement. The United States Court of Appeals for the First Circuit recently confronted the same question in *Northeastern Land Servs., Ltd. v. NLRB*, __ F.3d __, No. 08-1878, 2009 U.S. App. LEXIS 5267 (1st Cir. Mar. 13, 2009), and concluded that "[t]he Board's delegation of its institutional power to a panel that ultimately consisted of a two-member quorum because of a vacancy was lawful under the plain text of section 3(b)," *id.* at *12-13. After reviewing the text of section 3(b) of the Act, the First Circuit reasoned that

> First, section 3(b) allowed the Board to delegate all of its powers to a three-member group. Second, the statute states that "[a] vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board." The vacancy, which left the two-member quorum remaining, may not, under the terms of section 3(b), impair the right of the two-member quorum to exercise all powers of the Board.

*Id.* at *13 (quoting 29 U.S.C. § 153(b)) (second alteration in original). The First Circuit also acknowledged that the OLC Opinion recommended the same result, and posited that "any other general rule would impose an undue burden on the administrative process." *Id.* (internal quotation marks and alteration omitted). Finally, the First Circuit recognized that "courts have upheld analogous approaches by other administrative agencies," including the Securities and Exchange Commission and the National Mediation Board, seeking to continue to operate when confronting vacancies. *Id.* at *15 (collecting cases).

After the instant case was argued, two other courts of appeals issued relevant decisions. In *New Process Steel, L.P. v. NLRB*, __ F.3d __, No. 08-3517, 2009 U.S. App. LEXIS 9440 (7th Cir. May

---

465 U.S. 822, 830 n.7 (1984) ("Respondent argues that because the scope of the 'concerted activities' clause in Section 7 [of the Act] is essentially a *jurisdictional or legal question* concerning the coverage of the Act, we need not defer to the expertise of the Board. We have never, however, held that such an exception exists to the normal standard of review of Board interpretations of the Act; indeed, we have not hesitated to defer to the Board's interpretation of the Act in the context of issues substantially similar to that presented here." (emphasis added; citation and internal quotation marks omitted)).

1, 2009), the United States Court of Appeals for the Seventh Circuit concluded that a two-member panel of the NLRB—the same panel that adjudicated the instant case—"had authority to hear the labor dispute," *id.* at *21. In the Seventh Circuit's view, the "plain meaning" of section 3(b) of the Act "supports the NLRB's delegation procedure":

> [T]he vacancy of one member of a three[-]member panel does not impede the right of the remaining two members to execute the full delegated powers of the NLRB. As the NLRB delegated its full powers to a group of three Board members, the two remaining Board members can proceed as a quorum despite the subsequent vacancy.

*Id.* at *12.

Having concluded that the two-member panel had jurisdiction under the "plain meaning" of the Act, the Seventh Circuit nonetheless commented on its legislative history. *See id.* at *15 ("When the plain meaning of a statute is unambiguous, we need not consider a statute's legislative history or analogous cases in order to interpret it. However, we also take time to note that the legislative history behind § 3(b) does not support New Process' reading of the statute." (citation omitted)). Specifically, the court discussed the history of the Taft-Hartley amendments of 1947, which expanded the NLRB's membership from three to five. *See id.* at *16-17 (citing, *inter alia*, S. Rep. No. 80-105, at 8 (1947) ("There is no field in which time is more important, yet the Board is from 12 to 18 months behind in its docket. . . . The expansion of the Board from three to seven members,[5] which this bill proposes, would permit it to operate in panels of three, thereby increasing by 100 percent its ability to dispose of cases expeditiously in the final stage . . . ."), *reprinted in* 1 NLRB, *Legislative History of the*

---

[5] As the Seventh Circuit explained, the membership of the Board was ultimately expanded to five members, rather than seven, as the Senate bill proposed:

> The House version created a Labor-Management Relations Board of three members whose sole duty was to decide cases. H.R. Rep. No. 80-245, at 25 (1947). The Senate version expanded the size of the NLRB from three members to seven but included the delegation and quorum provisions. S. Rep. [No.] 80-105, at 19 (1947). The eventual bill, which expanded the NLRB to five members, was a compromise between the two versions.

*New Process Steel*, 2009 U.S. App. LEXIS 9440, at *16.

*Labor Management Relations Act, 1947*, at 407, 414 (1948) (hereinafter "*Leg. Hist.*")). In the Seventh

Circuit's view, "[t]he purpose of the [Taft-Hartley] revisions . . . was to allow the NLRB to hear *more*

cases by creating panels of the entire Board." *New Process Steel*, 2009 U.S. App. LEXIS 9440, at *17

(emphasis added); *accord Hall-Brooke Hosp. v. NLRB*, 645 F.2d 158, 162 n.6 (2d Cir. 1981) ("Section

3(b) of the NLRA authorizes the Board 'to delegate to any group of three or more members any or

all of the powers which it may itself exercise.' Congress added this provision to the NLRA to enable

the Board to handle an increasing caseload more efficiently." (citation omitted)). In light of the

legislative history of the Taft-Hartley amendments, the Seventh Circuit concluded that "a court

interpreting the statute [to restrict the NLRB from acting when its membership falls below a certain

level] would hinder the efficient panel operation that Congress intended to create." *New Process Steel*,

2009 U.S. App. LEXIS 9440, at *17.

On the same day that the Seventh Circuit decided *New Process Steel*, the United States Court of

Appeals for the District of Columbia Circuit ("D.C. Circuit") reached a different conclusion in *Laurel*

*Baye Healthcare of Lake Lanier, Inc. v. NLRB*, __ F.3d __, No. 08-1214, 2009 U.S. App. LEXIS 9419

(D.C. Cir. May 1, 2009). Relying principally on the "at all times" requirement for Board quorum, *see*

29 U.S.C. § 153(b) ("A vacancy in the Board shall not impair the right of the remaining members to

exercise all of the powers of the Board, and three members of the Board shall, *at all times*, constitute a

quorum of the Board, except that two members shall constitute a quorum of any group designated

pursuant to the first sentence hereof." (emphasis added)), the D.C. Circuit concluded that "a

three-member Board may delegate its powers to a three-member group, and this delegee group may

act with two members so long as the Board quorum requirement is, 'at all times,' satisfied." *Laurel*

*Baye Healthcare*, 2009 U.S. App. LEXIS 9419, at *9. In the D.C. Circuit's view, whenever the Board

loses jurisdiction because of a loss of quorum, so too do any panels of the Board lose jurisdiction,

regardless of whether the panels retain a quorum.

The D.C. Circuit considered and rejected the NLRB's argument that the "except that" clause

11

was an exception to the "at all times" requirement. *See* 29 U.S.C. § 153(b) ("[T]hree members of the Board shall, *at all times*, constitute a quorum of the Board, *except that* two members shall constitute a quorum of any group designated pursuant to the first sentence hereof." (emphases added)). In the D.C. Circuit's view, "Congress's use of differing object nouns ['quorum of the Board' *versus* 'quorum of any group'] within the two quorum provisions indicates clearly that each quorum provision is independent from the other." *Laurel Baye Healthcare*, 2009 U.S. App. LEXIS 9419, at *10. Accordingly, the D.C. Circuit concluded that "[t]he delegee group quorum provision does not eliminate [the Board's quorum] requirement," *id.* at *11, nor does it permit the two-member panel to "circumvent the statutory Board quorum requirement," *id.* at *9.

The D.C. Circuit did not discuss the legislative history of the Taft-Hartley amendments, but instead included a discussion of agency law (meaning "principal-agent" law, not the law of administrative agencies), which—in that court's view—applied to the delegation of full powers from a board to a committee or subgroup of a board. According to the D.C. Circuit, "an agent's delegated authority terminates when the powers belonging to the entity that bestowed the authority are suspended." *Id.* at *11 (citing the Restatement (Third) of Agency § 3.07(4) (2006) ("When a principal that is not an individual ceases to exist or commences a process that will lead to cessation of its existence or when its powers are suspended, the agent's actual authority terminates except as provided by law.")). Because "the delegee committee does not act on its own behalf[,] [but on] . . . that of the Board," where a Board loses its authority, so do its committees. *Laurel Baye Healthcare*, 2009 U.S. App. LEXIS 9419, at *12.

To summarize, one of our sister circuits—the Seventh Circuit—has upheld a decision by the two-member NLRB panel based on the "plain meaning" of section 3(b) of the Act, noting that its interpretation comports with the legislative history of relevant amendments to the Act, without discussing principles of agency (*i.e.* principal-agent) law. *New Process Steel*, 2009 U.S. App. LEXIS 9440, at *11-12. Another of our sister circuits—the D.C. Circuit—has overturned a decision by the

12

same two-member panel based on the plain language of section 3(b) of the Act, noting that its interpretation comports with applicable principles of agency law, but without discussing the applicable legislative history. *See Laurel Baye Healthcare*, 2009 U.S. App. LEXIS 9419, at *9. A third sister circuit—the First Circuit—has concluded that the "plain text" of the Act authorized the decisions by the same two-member panel, without discussing either the legislative history of the statute or relevant principles of agency law. *Northeastern Land Servs.*, 2009 U.S. App. LEXIS 5267, at *13.

The question regarding the jurisdiction of the NLRB's two-member panel is one ultimately to be resolved by the Supreme Court. In the meantime, we must make a determination in the present case.

## C. The NLRB Panel Was Duly Constituted in the First Instance

We first consider petitioner's argument that the NLRB panel was not duly constituted in the first instance because the delegation to a panel plenipotentiary was a "sham," Petitioners' Br. at 19, and begin our analysis with the statute itself, as our sister circuits have done. Section 3(b) of the Act provides that the NLRB

> is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise. . . . A vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board, and three members of the Board shall, at all times, constitute a quorum of the Board, except that two members shall constitute a quorum of any group designated pursuant to the first sentence hereof.

29 U.S.C. § 153(b).

Here, we agree with the First Circuit that, in light of the text of the statute, which expressly authorizes the NLRB "to delegate to any group of three or more members any or all of the powers which it may itself exercise," *id.*, the delegation to a panel plenipotentiary was within the NLRB's authority. *See Northeastern Land Servs.*, 2009 U.S. App. LEXIS 5267, at *13 ("[S]ection 3(b) allowed the Board to delegate all of its powers to a three-member group."). That the NLRB knew that the

13

membership of the panel would soon be reduced from three to two—and that Board's membership would also decrease to two—has no bearing on the fact that the panel was lawfully constituted in the first instance.

Petitioners argue that *Northeastern Land Services* is unpersuasive because the First Circuit did not discuss in that decision the relevance of 28 U.S.C. § 46, which sets the requirements for service on a three-member panel of a federal court of appeals. *See* Letter of Charles P. Roberts, III, counsel for Snell Island, April 3, 2009, at 1. As petitioners note, the Supreme Court has interpreted 28 U.S.C. § 46 to "require[ ] the inclusion of at least three [Article III] judges in the first instance," *Nguyen v. United States*, 539 U.S. 69, 82 (2003), as a prerequisite to any valid decision by a quorum, *see* 28 U.S.C. § 46(d). We agree with petitioners that, like a three-member panel of a federal court of appeals, a three-member panel of the NLRB must be duly constituted "in the first instance," *Nguyen*, 539 U.S. at 82, before the action of a quorum of the panel is valid. In the instant case, we agree with the First Circuit that the three-member panel of the NLRB that took effect on December 28, 2007, was duly constituted. *See Northeastern Land Servs.*, 2009 U.S. App. LEXIS 5267 at *12-13.

**D. The NLRB Panel Retained Jurisdiction When the Board Lost Its Quorum**

The more difficult question is whether the NLRB panel lost its authority once the NLRB as a whole lost its quorum. As required under *Chevron*, we consider first "'whether Congress has directly spoken to the precise question at issue.'" *N.Y. State Office of Children & Family Servs.*, 556 F.3d at 97 (quoting *Chevron*, 467 U.S. at 842). On this point, two of our sister circuits disagree over the "plain meaning" of section 3(b) of the Act. *Compare New Process Steel*, 2009 U.S. App. LEXIS 9440, at *12 ("As the NLRB delegated its full powers to a group of three Board members, the two remaining Board members can proceed as a quorum despite the subsequent vacancy.") *with Laurel Baye Healthcare*, 2009 U.S. App. LEXIS 9419, at *12 ("Reading the two quorum provisions harmoniously, the result is clear: a three-member Board may delegate its powers to a three-member group, and this

14

delegee group may act with two members so long as the Board quorum requirement is, 'at all times,' satisfied."). At the very least, this split suggests that the statute is ambiguous regarding the enduring or residual powers of an NLRB panel once the Board has lost a quorum.

In our view, nothing in the statute itself explains what happens to a duly constituted *panel* of the NLRB when the *Board* itself loses its quorum. Accordingly, since the statute is silent on the precise question, "we turn to canons of construction and, if that is unsuccessful, to legislative history to see if those interpretative clues permit us to identify Congress's clear intent." *N.Y. State Office of Children & Family Servs*, 556 F.3d at 97 (internal quotation marks omitted).

The canons of statutory construction do not shed any light on Congress's intent in the circumstances presented in the instant case. The D.C. Circuit, relying on "[a] cardinal principle of interpretation . . . that no provision is rendered inoperative or superfluous, void or insignificant," *Laurel Baye Healthcare*, 2009 U.S. App. LEXIS 9419, at *8 (internal quotation marks omitted), held that "the Board quorum requirement must be satisfied '*at all times*,'" *id.* (quoting 29 U.S.C. § 153(b)). We agree with this portion of the D.C. Circuit's analysis. *See Filler v. Hanvit Bank*, 378 F.3d 213, 220 (2d Cir. 2004) (citing with approval *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 698 (1995), for the proposition that courts should avoid interpretations of statutes that "render statutory language surplusage"). However, the application of this "cardinal principle of interpretation" does not answer the precise question presented here: once the Board has lost its quorum, what happens to a panel that was duly constituted before the Board lost its quorum? To answer this question, the D.C. Circuit relied on "basic tenets of agency and corporation law." *Laurel Baye Healthcare*, 2009 U.S. App. LEXIS 9419, at *11 (citing, *inter alia*, Restatement (Third) of Agency § 3.07(4) (2006)). In the view of the D.C. Circuit, "[a]n agent's delegated authority is . . . deemed to cease upon the resignation or termination of the delegating authority," *id.*, so that "[i]f the Board has no authority, it follows that the [panel] has none," *id.* at *12.

15

Our Court's precedents, however, require us to turn to legislative history instead of considering related fields of law—as the D.C. Circuit did in consulting agency and corporation law—in the event that ordinary canons of statutory interpretation are unhelpful. *See N.Y. State Office of Children & Family Servs.*, 556 F.3d at 97. Our survey of the legislative history of the Taft-Hartley Act, which created the NLRB's panel system, reveals that the broad animating purpose of the legislation was "to equalize the balance of power between employers and employees" in response to the "widespread feeling that the unions had gotten too much power during the Roosevelt years." Lawrence M. Friedman, *American Law in the 20th Century* 189 (2002). Among other things, the Taft-Hartley amendments outlawed "closed shops" and secondary boycotts, permitted employers to sue unions for breach of contract, and—in the words of Senator Robert A. Taft of Ohio, the Chairman of the Senate Committee of Labor and Public Welfare—"entirely rewr[ote] the Wagner Act." 93 Cong. Rec. 3753, 3786 (Apr. 17, 1947), *reprinted in* 2 NLRB, *Leg. Hist.* 1000, 1000.

In light of the sweeping nature of the Taft-Hartley amendments and their focus on the balance of power in dealings with organized labor, it is surprising that the reforms to the structure of the NLRB received relatively little attention in the legislative history. Senator Taft explained in his floor remarks that the purpose of increasing the NLRB's membership was to enable the Board to "accomplish twice as much in the way of the number of hearings held." 93 Cong. Rec. 3950, 3953 (Apr. 23, 1947), *reprinted in* 2 NLRB, *Leg. Hist.* 1005, 1011. This was particularly important because "the Board [was] behind in its work, and [the Taft-Hartley amendments would] impose a considerably greater volume of work upon the Board." *Id.*[6]

---

[6] Some opponents of the Taft-Hartley Act, including Senator Wayne L. Morse of Oregon, also acknowledged that the purpose of expanding the membership of the Board was to enable the Board to increase its efficiency. *See* 93 Cong. Rec. 6593, 6614 (June 5, 1947) ("So I think it is very important that we have a seven-man board, rather than a five-man board, because I wish to see two departments, composed of three men each, sitting day after day and week after week in the hearings held by the board, in order to keep the board up to date in respect to its docket."), *reprinted in* 2 NLRB, *Leg. Hist.* 1526, 1562.

In light of Senator Taft's remarks, we have previously observed that "Section 3(b) of the NLRA authorizes the Board 'to delegate to any group of three or more members any or all of the powers which it may itself exercise.' Congress added this provision to the NLRA to enable the Board to handle an increasing caseload more efficiently." *Hall-Brooke Hosp.*, 645 F.2d at 162 n.6 (citation omitted)). In *Hall-Brooke Hospital*, we also examined a report by the Senate Committee on Labor and Public Welfare, which concluded that "[t]here is no field in which time is more important, yet the Board is from 12 to 18 months behind in its docket. . . . The expansion of the Board . . . would permit it to operate in panels of three, thereby increasing by 100 percent its ability to dispose of cases expeditiously in the final stage . . . ." S. Rep. No. 80-105, at 8 (1947), *reprinted in* 1 NLRB, *Leg. Hist.* 407, 414; *see also New Process Steel*, 2009 U.S. App. LEXIS 9440, at *16-17 (considering the Senate Report and concluding that "Congress['s] . . . primary concern was increasing the efficiency of the Board. . . . The purpose of the [Taft-Hartley] revisions . . . was to allow the NLRB to hear more cases by creating panels of the entire Board.").[7]

In addition to the legislative history described in *Hall-Brooke Hospital*, the NLRB argues that prior to the Taft-Hartley amendments of 1947, the Board consisted of three members, two of whom were required for a quorum. *See* Resp't Br. 16; *see also* Pub. L. No. 74-198 § 3(a), 49 Stat. 449, 451 (1935) ("There is hereby created a board . . . which shall be composed of three members . . . ."); *id.* § 3(b) ("A vacancy in the Board shall not impair the right of the remaining members to exercise all the powers of the Board, and two members of the Board shall, at all times, constitute a quorum."). As the NLRB notes, "Pursuant to that two-member quorum provision, the original Board, during its 12 years of administering federal labor policy, issued hundreds of decisions with only two of its three

[7] The House Report did not discuss an expansion of the Board's membership. *See* H.R. Rep. No. 80-245, at 25 (1947), *reprinted in* 1 NLRB, *Leg. Hist.* 292, 316. The House Conference Report noted the differences between the House and Senate bills, and concluded simply that "[t]he conference agreement . . . retains the existing Board but increases its membership to five," without commenting on the purpose of the amendment. H.R. Rep. No. 80-510, at 37 (1947) (Conf. Rep.), *reprinted in* 1 NLRB, *Leg. Hist.* 505, 541.

seats filled." Resp't Br. 16. Specifically,

> From 1935 to 1947, the original Board issued 466 decisions during three discrete periods when it had only two seated members. First, from August 27 through October 11, 1941, the two-member Board issued 224 decisions. Second, from August 27 to November 26, 1940, a two-member Board issued 239 decisions. Third, from August 31 to September 23, 1936, a two-member Board issued three decisions.

Resp't Br. at 16-17 n.8 (citations omitted).

In our view it is significant, in light of the established history of operating with only two members, that Congress continued to allow only two Board members (a quorum of an NLRB panel) to issue labor decisions. While increasing the size of the Board from three members to five members, Congress left undisturbed the two-member quorum requirement for panels of the Board. Moreover, as the NLRB observes, "the Senate [version of the] bill would have expanded the Board to seven members, four of whom would be a quorum. However, that same bill authorized the larger Board to delegate its powers 'to any group of three or more members,' two of whom would be a quorum." Resp't Br. 17 (quoting S. 1126, § 3(b) (1947), *reprinted in* 1 NLRB, *Leg. Hist.* 107). *See ante* n.5 (describing the House and Senate versions of the Taft-Hartley amendments).

However, while this history seems to support the Board's reading of the Act, it does not definitively answer the precise question at issue in the instant case—whether, in the name of efficiency, a panel of the Board may continue to operate once the Board itself loses its quorum. The only reference to this precise question comes from the floor remarks of Senator Joseph C. O'Mahoney of Wyoming, in which he opposed overriding President Truman's veto of the Taft-Hartley Act.

> Observe that the Board is given complete and plenary power to delegate any or all of its power to any group of three; and then any two members of that group of three can speak for the Board. So we have a bill—and I invite the attention of lawyers in this body to this—which not only authorizes the Board to delegate its powers, but authorizes the Board to delegate its powers, and all of them, *to less than a quorum of the Board.* This we do in the name of reducing government in Washington. This we do in the name of returning control of the economic life of the people of the United States to the people of the United States; and we undertake a program of delegated powers which, so far as I know, has never been suggested

18

before in the history of this Government.

93 Cong. Rec. 7677, 7679 (June 23, 1947) (emphasis added), *reprinted in* 2 NLRB, *Leg. Hist.* 1629, 1632. However, Senator O'Mahoney did not raise this objection in his earlier floor statements concerning section 3 on May 6 and May 12, 1947, *see* 2 NLRB, *Leg. Hist.* 1263, 1467, and none of the other Senators—including Senator Taft—responded to Senator O'Mahoney's pointed criticism of the panel quorum requirement in the debate that followed prior to a vote to override the President's veto on the same day.

We are reluctant to draw much significance from a lone remark by a single senator opposing a bill, made after the Taft-Hartley Act initially passed and only just before the Senate voted to override President Truman's veto. *See Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 395-96 (1951) (Jackson, *J.*, concurring) (arguing in favor of limiting "legislative history" to "Committee reports" because "to select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions"). Without more, we are unable to conclude that delegation to less than a quorum of the Board was an intended or unintended consequence of the Taft-Hartley amendments.

In short, we draw two conclusions about the quorum requirement in section 3(b) of the Act from this discussion of the legislative history of the Taft-Hartley amendments. First, Congress restructured the NLRB to enable it to resolve more disputes, not fewer. As a result, we adhere to our prior observation that one of the purposes of the Taft-Hartley amendments was to increase the NLRB's efficiency. *See Hall-Brooke Hosp.*, 645 F.2d at 162 n.6; *see also New Process Steel*, 2009 U.S. App. LEXIS 9440, at *18 ("To the extent that the legislative history points either way . . . it establishes that Taft-Hartley created a Board that functioned as an adjudicative body that was allowed to operate in

19

panels in order to work more efficiently.").[8]  Second, the legislative history of the Taft-Hartley

amendments lacks any clear statement of intent regarding the jurisdiction of a plenipotentiary panel

where the Board loses its quorum—the precise question that we face in this case.  Where the

legislative history touches on the precise question, in Senator O'Mahoney's floor remarks,

Congressional intent is unclear.  "If . . . we . . . cannot conclude that Congress has *directly* addressed

the *precise* question at issue, we will proceed to *Chevron* step two, which instructs us to defer to an

agency's interpretation of the statute it administers, so long as it is reasonable."  *N.Y. State Office of

Children & Family Servs.*, 556 F.3d at 97 (emphases added; internal quotation marks omitted); *see also*

*Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 120 (2d Cir. 2007) (observing that, when a statute is

ambiguous, a court "look[s] to structure, purpose, and history to determine whether these

construction devices can convincingly resolve the ambiguity at *Chevron* step one," and that "[a] high

level of clarity is necessary to resolve textual ambiguity in this manner" (internal quotation marks

omitted)).  Accordingly, we examine with appropriate deference the NLRB's interpretation of the

Act's quorum requirement.

The NLRB's interpretation of the Act is straightforward.  The Act expressly permits the

NLRB to delegate all or part of its powers to a three-member panel, for which two members

constitute a quorum.  *See* 29 U.S.C. § 153(b).  Although the Act does not expressly provide that a

panel retains jurisdiction where the Board loses its quorum, neither does the Act state that the panel

loses jurisdiction in such circumstances.  In light of the animating purpose of the Taft-Hartley

amendments at issue here, which permitted the NLRB to continue to operate in panels of as few as

two members in order to increase the Board's overall efficiency, the NLRB interprets the Act as

---

[8] We are mindful that vacancies on the governing boards of "independent" federal agencies
are filled by presidential nominations with the advice and consent of the Senate, and delays are a
common occurrence.  Courts have generally been sympathetic to a federal agency's efforts to
continue to operate in the face of vacancies, and have interpreted quorum requirements to permit an
agency to function.  *See Northeastern Land Servs.*, 2009 U.S. App. LEXIS 5267, at *15 (collecting
cases).

20

permitting the two remaining members of the Board to issue labor decisions despite the Board's lack of a quorum.

In our view, this is a reasonable interpretation of the statute. Indeed, we commend the NLRB for its conscientious efforts to stay "open for business" in the face of vacancies that it did not create and for which it lacked the authority to fill. Of course, the D.C. Circuit's view that where a Board loses its authority, so does its panels, *see Laurel Baye Healthcare*, 2009 U.S. App. LEXIS 9419, at *12, is also a reasonable interpretation of the Act. However, in applying *Chevron* deference, an agency's "view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, __ U.S. __, 129 S. Ct. 1498, 1505 (2009) (emphasis omitted). Accordingly, we hold that the NLRB panel in this case was a lawfully convened panel of three members. Because of the existence of a two-member quorum, the panel continued to operate in accordance with section 3(b) of the Act after one of its members ceased to serve on the Board and even though the Board itself lost a quorum.

## III. Regional Director's Certification

Petitioners' remaining claim—that the NLRB's regional director should not have certified the union election in this case without first holding a pre-certification hearing and interviewing witnesses—is without merit. We review such objections under a deferential "abuse of discretion" standard. *See, e.g.*, *NLRB v. HeartShare Human Servs. of N.Y., Inc.*, 108 F.3d 467, 470 (2d Cir. 1997) ("Congress has given the NLRB broad discretion in the conduct and supervision of representation elections, and consequently the Board's decision earns considerable deference. Our review is limited to determining whether the Board reasonably exercised its discretion." (citation omitted)); *Arthur Sarnow Candy Co.*, 40 F.3d at 556 ("'[T]he conduct of representation elections is the very archetype of a purely administrative function, with no *quasi* about it, concerning which courts should not interfere

21

save for the most glaring discrimination or abuse.'" (quoting *NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir. 1970) (Friendly, *J.*))); *NLRB v. Springfield Hosp.*, 899 F.2d 1305, 1312 (2d Cir. 1990) ("[A] party seeking to set aside an election has the heavy burden of establishing that the Board abused its discretion in certifying the election." (internal quotation marks omitted)); *cf. Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) ("A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." (citation, alterations, and internal quotation marks omitted)).

A pre-certification hearing before an NLRB regional director regarding objections to a union election is not required by federal regulation unless the challenging party "raise[s] substantial and material factual issues." 29 C.F.R. § 102.69(d) ("In issuing a report on objections or challenged ballots, or both, . . . or in issuing a decision on objections or challenged ballots, or both, . . . the regional director *may* act on the basis of an administrative investigation or upon the record of a hearing before a hearing officer. Such hearing *shall* be conducted with respect to those objections or challenges which the regional director concludes raise substantial and material factual issues." (emphasis added)); *see also NLRB v. Semco Printing Ctr., Inc.*, 721 F.2d 886, 891 (2d Cir. 1983) ("[A] party is entitled to have a hearing only if it demonstrates by *prima facie* evidence the existence of substantial and material factual issues which if resolved in its favor, would require the setting aside of the representation election." (internal quotation marks omitted)).

In the instant case, petitioners were afforded an opportunity to submit "[a]ffidavits, signed statements, documents or other appropriate material which constitutes prima facie evidence of each of the filed objections" to the NLRB regional director. J.A. 28. The regional director reviewed petitioners' proffered evidence, including a letter from petitioners stating that at least two employees would testify that several co-workers told them prior to the union election that "if they were going to

22

vote 'No' it would be best for them not to vote at all," J.A. 40 (Report on Objections to [the] Election and Recommendations to the Board, Jan. 18, 2008, at 4.).  The regional director found that these submissions were, at best, hearsay statements by management that employees had asserted complaints about a general atmosphere of union intimidation.  In light of this finding, the regional director concluded that the evidence did not support petitioners' objections because second- or third-hand allegations of intimidation, without specific allegations of voter coercion or other misconduct, could not constitute an unfair labor practice.  *See, e.g.*, *NLRB v. Basic Wire Prods., Inc.*, 516 F.2d 261, 264 (6th Cir. 1975) (stating that the NLRB "properly refused to invalidate the election or to hold a hearing on the allegations" of election abuses where "[t]he only evidence proffered by [employer] was an affidavit of its Vice President to the effect that 'union people' told several employees 'that it would pay to support the Union'").  We agree.  Petitioners did not "demonstrate by *prima facie* evidence the existence of substantial and material factual issues," *Semco Printing Ctr.*, 721 F.2d at 891 (internal quotation marks omitted).  Accordingly, we detect no error in the regional director's decision to forgo a hearing in this case.

## CONCLUSION

For the foregoing reasons, we **DENY** the petition for review of the NLRB's July 18, 2008 Decision and Order.  We **GRANT** the NLRB's cross-application for enforcement.

23